IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Solomon Ellison, | : | |
| | : | Case No. 1:17-cv-689 |
| Plaintiff, | : | |
| | : | Judge Michael R. Barrett |
| v. | : | |
| | : | |
| Trooper Jeffrey Martin, | : | |
| | : | |
| Defendant. | : | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Trooper Jeffrey Martin's Motion for Summary Judgment (Doc. 31). Plaintiff Solomon Ellison filed a Memorandum in Opposition (Doc. 37), to which Trooper Martin filed a Reply (Doc. 42). In this civil rights case arising from a lawful traffic stop, Ellison alleges Trooper Martin detained him longer than necessary and then arrested him without probable cause. For the reasons that follow, the Court disagrees and will **GRANT** the Motion for Summary Judgment.

**I.      Background**

      **A.      Facts Underlying the Claims**

Just after 1:00 a.m. in the morning on July 10, 2016 in Mason, Ohio, Ellison was driving home from a movie with his fianceé, Sheena Davis. (Doc. 31-1, PageID 242.) Trooper Martin, an officer with the Ohio Highway Patrol, was driving in the area. When Trooper Martin turned on to Irwin Simpson Road, he saw the vehicle in front of him change lanes without signaling. (Video 1:04:09.) The vehicle next turned right onto Mason Montgomery Road without signaling. (Video 1:04:38.) The vehicle then weaved right over the white-striped line and

1

weaved left at least touching the yellow left lane line, before the driver finally signaled right and changed lanes. (Video 1:04:59, 1:05:05.) Trooper Martin pulled over the vehicle on Mason Montgomery Road for the traffic violations. (Video 1:05:21; Doc. 31-2, PageID 406–407.) The driver of the vehicle, Plaintiff Ellison, appropriately pulled to the side of the road and parked.

Ellison believed on the night of the incident that Trooper Martin initiated the traffic stop because he is African American. However, after watching the video of the traffic stop, he conceded that he turned right onto Mason Montgomery Road without using his turn signal. (Doc. 31-1, PageID 273.) He further conceded that Trooper Martin could not have known his race while he was driving and that the traffic stop was not racially motivated. (*Id.*, PageID 273–275, 304–305.) Nonetheless, Ellison's concern on the night of the incident that the traffic stop was racially motivated permeated the encounter between Ellison and Trooper Martin.

At the beginning of the stop, Ellison rolled down his window, and Trooper Martin politely requested his driver's license, proof of insurance, and registration. (Video 1:05:48.) Ellison immediately provided the documents, but his identification fell to the ground as he attempted to hand it to Trooper Martin. (Video 1:06:07.) Troop Martin later testified that he detected "a strong odor of an alcoholic beverage coming from the vehicle" which was a "sweet, fruity smell." (Doc. 31-2, PageID 407, 464.) Ellison and Davis denied that there was any odor of alcohol on Ellison or in the car. (Doc. 35, PageID 1074; Doc. 31-3, PageID 685–687.)

When asked, Trooper Martin told Ellison that he stopped him for not using a turn signal and for marked lane violations. (Video 1:06:34.) Ellison expressed his belief—later proven to be incorrect—that Trooper Martin followed him when he left the movie theater. (Video 1:06:43.) When Trooper Martin asked where he was headed, Ellison continued to discuss the

2

traffic violation.  Ellison said "let's get with it" and "may I have my ticket?"  (Video 1:07:03.)  Ellison repeated his request for the ticket when Trooper Martin next asked his how much he had to drink.  (Video 1:07:09.)

At this point, Trooper Martin asked Ellison to step out of his vehicle.  (Video 1:07:13.)  Ellison responded that he did not want to step out of the vehicle and asked Trooper Martin call his supervisor.  (Video 1:07:14.)  Trooper Martin then opened the driver's side vehicle door.  (Video 1:07:16.)  At some Trooper Martin grabbed his taser with his right hand after he opened the vehicle door.  (Doc. 31-2, PageID 423.)  His right arm was bent at a right angle and pointed towards Ellison as they continued to talk, but the video does not show where his hand or the taser is pointed.  Ellison testified at his deposition that he could not recall whether the taser was pointed at him.  (Doc. 35, PageID 1088–1089.)

Nonetheless, Ellison told Trooper Martin that he did not feel comfortable, he stated that he did not have a gun, and he requested multiple times that Trooper Martin call his supervisor.  (Video 1:07:17.)  Trooper Martin denied that he had to call his supervisor.  (Video 1:07:24.)  Ellison again denied that he had been drinking.  (Video 1:07:27.)  Trooper Martin and Ellison continued to go back and forth with Trooper Martin stating that he wanted Ellison to step out of the car and Ellison stating that he did not "feel safe or comfortable."  (Video 1:07:28.)  Ellison told his fiancée, Sheena Davis, that she should call 911.  (Video 1:07:33.)  Trooper Martin stated that he was the one "in control right here," but he agreed that Davis could call 911.  (Video 1:07:34.)  While Ellison continued to request a supervisor and state that he did not feel comfortable, Trooper Martin told Ellison that he "could exit the vehicle" or Trooper Martin

3

"would pull [him] out of the vehicle." (Video 1:07:42.)[1]

The two men then began to talk over each other at a faster pace for the next twenty-five seconds or so. (Video 1:07:46.) Trooper Martin ordered Ellison to exit the vehicle at least five times. Ellison did not comply, but instead he stated that he did not want to be shot or tased. Trooper Martin reached in to undo the seat belt buckle after Ellison verified that he did not have a gun. (Video 1:08:02; Doc. 31-2, PageID 430.) As Ellison then stepped out of the vehicle, Davis can be heard telling the 911 operator their location. (Video 1:08:07.) Trooper Martin patted down Ellison with his consent after Ellison again denied having a weapon. (Video 1:08:26.) When Ellison suggested that Davis "get out of the car," Trooper Martin instructed her to stay in the vehicle. (Video 1:08:48.) Ellison continued to ask Trooper Martin to call a supervisor and gestured with his hands as he spoke. (Video 1:09:07.)

Trooper Martin then asked Ellison to face him so he could "take a look at your eyes and make sure [he] could drive." (Video 1:09:20.) Ellison responded with a raised voice in frustration:

> I haven't been fucking drinking, man. I haven't had one fucking drink. Call the supervisor. I asked you that three times. I asked you nicely.

(Video 1:09:21.) Ellison gestured up and down with both arms, and then moved his left arm (from the elbow) up and down rapidly as he yelled, "I asked you that three times." (*Id.*) Davis told Ellison to "calm down" at that time because he "sound[ed] agitated." (Doc. 31-3, PageID 618.) She was concerned for Ellison's safety and did not "want the officer to do anything to

---

[1] Ellison believed based on conversations he had had with officers from the Hamilton County Sheriff's Office that a law enforcement officer had to call a supervisor if he requested it. (Doc. 31-1, PageID 284–285.) He requested the presence of supervisor, or other officers via the 911 call, because he wanted to deescalate the situation and reduce the threat he felt from Trooper Martin. (*Id.*, PageID 294–296.)

4

him" because Ellison was agitated. (*Id.*)

Trooper Martin arrested Ellison and placed him in handcuffs after his outburst. (Video 1:09:33.) Ellison did not resist the arrest, but he continued to verbally argue with Trooper Martin for more than one minute. (Video 1:09:34.) Trooper Martin placed Ellison, who was handcuffed, in his cruiser. (Video 1:11:20.) Trooper Martin testified that he arrested Ellison for disorderly conduct at that time because Ellison was displaying "signs of aggression[,]" "being loud[,]" and "impeding [his] investigation." (Doc. 31-2, PageID 409– 411.)

Deputies from the Warren County Sheriff's Office arrived at the scene in response to the 911 call around the time that Trooper Martin placed Ellison in his cruiser. Trooper Martin then spoke to Davis in the vehicle. He asked her if she or Ellison had been drinking. (Video 1:13:46.) Davis stated that neither of them had anything to drink. (Video 1:13:54.) Trooper Martin told Davis that Ellison had been arrested for disorderly conduct and driving while intoxicated because, in part, Trooper Martin smelled alcohol in the vehicle and on Ellison's breathe. (Video 1:14:02.) He asked if Davis would take a portable breathalyzer test so he could be sure she was safe to drive the vehicle. (Video 1:14:19.) The test results indicated that she had not had anything to drink. (Video 1:16:45.) Trooper Martin requested Ellison to take a portable breathalyzer test, he consented, and his test also confirmed that he had not been drinking alcohol. (Video 1:18:33, 1:19:30.)

Trooper Martin released Ellison without charging him after the negative tests and after he learned there was no room for Ellison at the Warren County jail. (Video 1:17:41, 1:24:06; Doc. 31-2, PageID 512.) When Trooper Martin asked why he had "made a big deal" about getting out of the vehicle, Ellison responded that he had a "intrinsic fear" of police based on

5

previously "being brutalized" by police officers. (Video 1:23:18.)

### B. Procedural Posture

Ellison filed this suit against Trooper Martin on October 13, 2017. (Doc. 1.) He asserted a claim for violation of his First and Fourth Amendment rights pursuant to 42 U.S.C. § 1983. (*Id.*) Trooper Martin filed a timely Answer. (Doc. 6.) Following discovery, Trooper Martin filed the pending Motion for Summary Judgment arguing that he is entitled to judgment as a matter of law on the basis of qualified immunity. The Motion is fully briefed and ready for adjudication.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–249 (1986).

In reviewing a summary judgment motion, courts are required to view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In the qualified immunity context, "'this usually means adopting ... the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record, so that no

reasonable jury could believe it.'" *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (quoting *Scott*, 550 U.S. at 378, 380).

### III. Analysis

#### A. Section 1983 and Qualified Immunity Standards

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Suttle v. Oklahoma City*, 471 U.S. 808, 816 (1985). "Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights." *Flint v. Ky. Dep't of Corrs.*, 270 F.3d 340, 351 (6th Cir. 2001). In this case, Ellison alleges a violation of his First and Fourth Amendment rights. The First Amendment protects "freedom of speech." U.S. Const. amend. I. The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV.

Trooper Martin asserts the defense of qualified immunity. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has explained:

> To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

*Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (footnote omitted).

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014); *see also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996) ("A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred."). The plaintiff bears the burden of proving both elements of the *Saucier* test. Although qualified immunity is an affirmative defense that must be raised by a defendant, once an official raises the defense "the burden is on the plaintiff to demonstrate that the official [is] not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Henry v. City of Flint, Mich.*, 814 F. App'x 973, 980 (6th Cir. 2020) (citation omitted).

    B.    **Fourth Amendment Claims**

        1.    **Traffic Stop Detention and the Field Sobriety Test**

Ellison makes the preliminary argument that Trooper Martin did not have a reasonable suspicion to detain him longer than was necessary to issue the citation for the traffic infractions. The Fourth Amendment prohibits traffic stops without probable cause that a traffic violation occurred, and it prohibits the continuation of a traffic stop to conduct a field sobriety test without reasonable suspicion that the driver was impaired. *Throckmorton*, 681 F.3d at 860.

8

Ellison concedes that the traffic stop was justified because he turned onto Mason Montgomery Road at a traffic light without signaling. Ohio Revised Code § 4511.39 requires that a driver signal before changing lanes or making a turn. Ellison disputes, however, the length of the traffic stop and whether Trooper Martin had reasonable suspicion to conclude that he was driving while impaired.

As part of the initial traffic stop, Trooper Martin had authority to "check[] the driver's license, determin[e] whether there [were] outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Rodriguez v. U.S.*, 575 U.S. 348, 355 (2015). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Additionally, he was lawfully permitted to ask "traffic-related questions" and questions about Ellison's "identity, business and travel plans." *United States v. Potts*, No. 97-6000, 1999 WL 96756, at *4 (6th Cir. Feb. 2, 1999); *see also United States v. Ellis*, 497 F.3d 606, 613–614 (6th 2007) ("Trooper Topp was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel.") Finally, Trooper Martin had the right to "order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Pennslyvania v. Mimms*, 434 U.S. 106, 111, n. 6 (1977)).[2] An officer does not need separate justification to remove the

---

[2] Ellison argues that Trooper Martin ordered him out of the car, not as part and parcel of the traffic stop, but in order to effectuate the field sobriety test without reasonable suspicion. This argument fails legally. Supreme Court caselaw "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996). Trooper Martin's subjective intentions are irrelevant to the Fourth Amendment analysis. *See, e.g., Scheffler v. Lee*, 752 F. App'x 239, 244 (6th Cir. 2018) (stating that it did not matter if an officer subjectively believed he had probable cause); *United States v. Parks*, 414 F.Supp.3d 1044, 1049 (N.D. Ohio 2019) (stating that the subjective intention of the officer completing the pat-down of a driver is irrelevant).

driver from the vehicle. *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016).

Although Trooper Martin had the authority to order Ellison out of his vehicle as part of the traffic stop, Trooper Martin could not continue the detention of Ellison to conduct a field sobriety test without reasonable suspicion that he was driving under the influence of alcohol. In fact, Trooper Martin acknowledged at his deposition that he did not have to give Ellison a field sobriety test in order to issue a ticket to Ellison for the traffic violations. (Doc. 31-2, PageID 506.) The Sixth Circuit has explained the reasonable suspicion standard as follows:

> Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch. It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. In conducting a reasonable-suspicion analysis, reviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing, while bearing in mind that officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. This totality-of-the-circumstances inquiry requires courts to determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

*Green*, 681 F.3d at 860–861 (cleaned up). Therefore, the Court must examine whether there were specific, objective facts giving rise to reasonable suspicion.

Ellison points out that he pulled over upon seeing the cruiser lights and immediately provided the requested identification documents. He directly answered Trooper Martin's initial questions. He did not dispute issuance of a traffic violation ticket for not signaling before he turned. He asserts that the video demonstrates that he understood Trooper Martin's questions and did not slur his speech in responding to those questions. He also cooperated and followed

10

directions after he exited the vehicle by allowing Trooper Martin to pat him down.[3]

On the other hand, Trooper Martin points to factors that support a finding of reasonable suspicion including the time and day of the stop, the location of the stop, erratic driving, the odor of alcohol, Ellison's demeanor and coordination. The traffic stop took place around 1:00 a.m. on the weekend in a commercial area. Ellison admits that he failed to signal a turn, and the video shows that he made other marked lane violations, all in the span of about one minute. Trooper Martin testified that he smelled the odor of alcohol, and consistent with that, he asked Ellison how much he had to drink as part of his opening set of questions. Trooper Martin testified that Ellison dropped his identification as he was handing it to him to review. Finally, Ellison refused to directly answer some questions posed to him, was argumentative and incorrect about his purported right to have a supervisor at the scene, and refused multiple requests to exit the vehicle.

On summary judgment, the Court must resolve all factual disputes in favor of the non-moving part, Ellison, so long as the dispute is not conclusively resolved by the video. The video does not show if Ellison or Trooper Martin is responsible for allowing Ellison's identification to fall to the ground. The video also is not probative as to whether there was an odor of alcohol

---

[3] Ellison also relies on the conclusion of his expert, Michael Lyman, Ph.D., who opined that the "common violation" of failure to use a turn signal did not standing alone provide suspicion that the driver was impaired. (Doc. 36, PageID 1141.) However, Lyman's opinion on whether Trooper Martin had reasonable suspicion is not admissible. It is the role of the Court to define a legal term such as reasonable suspicion and the role of the factfinder to determine if the facts satisfy the definition. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("It is the responsibility of the court, not testifying witnesses, to define legal terms."); *Morgan v. Westhoff*, No. 05-73583, 2006 WL 2474010, at *2 (E.D. Mich. Aug. 18, 2006) (not allowing experts to testify as to whether an officer had probable cause). In at least two prior cases, Dr. Lyman was precluded from testifying about the reasonableness of an officer's conduct because that determination is the ultimate legal determination for a jury. *See Gough v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-cv-849, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016); *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 689–691 (E.D. Mich. 2011).

emanating from Ellison or his vehicle. On this latter issue, Ellison and Davis both deny drinking or that the there was an odor of alcohol in the vehicle. The Sixth Circuit has instructed that "an officer's unsupported and contested observations regarding a driver's signs of impairment are called into question when a subsequent blood or urine test shows that the driver was not actually impaired." *Green*, 681 F.3d at 863. Here, Trooper Martin's credibility in testifying that he smelled alcohol is called into question in light of the undisputed fact that Ellison and Davis both tested 0.00 on the breathalyzer test.

Nonetheless, based on the remaining undisputed facts, it was reasonable for Trooper Martin to conclude that he had at least a reasonable suspicion that Ellison was impaired. Ohio court have identified numerous factors an officer can consider in making the decision to conduct a field sobriety test including the time and day of the stop, the location of the stop, erratic driving, bloodshot eyes, the odor of alcohol, the suspect's demeanor, and any admission of drinking. *Ohio v. Evans*, 127 Ohio App. 3d 56, 711 N.E.2d 761, 766 n.2 (1998); *see also Bradley v. Reno*, No. 4:12CV00890, 2014 WL 4955948, at *5 (N.D. Ohio Sept. 30, 2014) (quoting *Evans*), *aff'd,* 632 F. App'x 807 (6th Cir. 2015). Several of these factors were present. Trooper Martin witnessed Ellison commit several traffic violations in just over one minute during the overnight hours in an area with multiple alcohol-serving restaurants. Ellison did not answer standard questions such as where he was headed and whether he had been drinking. He stated that Trooper Martin should "get with it" and asked for his ticket. He was argumentative by repeatedly insisting that Trooper Martin call a supervisor after Trooper Martin declined to do so. Finally, he refused repeated commands to exit the vehicle before finally cooperating. These specific, articulable facts made it reasonable for Trooper Martin to extend the traffic stop in

order to conduct a field sobriety test. That Trooper Martin's reasonable suspicion that Ellison was impaired was proven to be incorrect is not relevant. A government official "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Hicks v. Scott*, 958 F.3d 421, 433 (6th Cir. 2020) (quotation omitted). "Qualified immunity therefore limits success in such suits to only those situations in which no reasonable officer, of all the universe of reasonable officers, would make a given decision." *Henry*, 814 F. App'x at 979.

Finally, this case is distinguishable from the primary case relied upon by Ellison, *Green v. Throckmorton*. There, the judge denied qualified immunity to the police officer on the basis that a jury could find facts under which the officer's suspicion of driver impairment was "plainly incompetent." 681 F.3d at 864. The driver there committed two minor traffic infractions—a lane violation and failure to dim high beams in the face of oncoming traffic—but it was a wet night with poor visibility, she was driving on unfamiliar roads, and she gave a rational explanation for why she had improperly used her high beams while driving. *Id.* The driver in *Green* also did not fail to answer the officer's questions, was not argumentative, and did not refuse a command. *Id.* at 856–857 (explaining the driver's cooperation). Conversely, Ellison seemed unaware that he made several traffic violations, he made them on a night without visibility problems, and his demeanor was argumentative throughout most of the traffic stop. Trooper Martin's suspicion of driver impairment was not plainly incompetent.

For these reasons, the Court concludes that Trooper Martin has qualified immunity on the Ellison's Fourth Amendment claim to the extent Ellison alleged that Trooper Martin unlawfully extended the traffic stop and attempted to conduct a field sobriety test.

### 2. Probable Cause Determination

Next, Ellison argues that he was arrested without probable cause in violation of the Fourth Amendment. *See Williams ex rel. Allen v. Cambridge Bd. of Educ.,* 370 F.3d 630, 636 (6th Cir. 2004) ("A law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime."); *Crockett v. Cumberland Coll.,* 316 F.3d 571, 580 (6th Cir. 2003) ("[A]ny arrest without probable cause violates the Fourth Amendment."). Trooper Martin arrested Ellison for disorderly conduct and impaired driving, before deciding to release him without charges. In moving for summary judgment, Trooper Martin argues that is entitled to qualified immunity because he had probable cause to arrest Ellison for those two offenses, plus for obstruction of official business or failure to comply with a lawful order.

"Probable cause exists if the facts and circumstances known to the arresting officer justify a prudent man in believing that a crime has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citation omitted). Whether an officer had probable cause is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citation omitted). "[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). The focus is on the facts the officer knew at the time of the arrest, but his subjective state of mind is irrelevant. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). In fact, "an arresting officer's 'subjective reason for making the arrest

14

need not be the criminal offense as to which the known facts provide probable cause.'" *United States v. Harness*, 453 F.3d 752, 755 (6th Cir. 2006) (quoting *Devenpeck,* 543 U.S. at 153). An officer cannot be liable for a Fourth Amendment violation so long as there was probable cause to make an arrest for any offense, even if not on the offense charged by the officer.

The existence of probable cause is generally a question for the jury, but the Court still must examine whether "there is only one reasonable determination possible based on the evidence produced by the parties." *Snyder v. Kohl's Dept. Stores, Inc.*, 580 F. App'x. 458, 462 (6th Cir. 2014) *(*quotation omitted). Probable cause is a legal question for the Court if the facts are not in dispute. *Penn v. Bergtold*, 803 F. App'x 900, 903 (6th Cir. 2020) (citing, in part, *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005)). The right to be free from arrest without probable cause was clearly established in 2016 for purposes of a qualified immunity analysis. *See*, *e.g.*, *Radvansky v. City of Olmsted Falls*, 395 F.3d at 311 (establishing that the Fourth Amendment prohibits "a law enforcement officer may not seize an individual except after establishing probable cause") (citation omitted).

The Court starts by examining whether Trooper Martin had probable cause to arrest Ellison for disorderly conduct. The disorderly conduct statute in Ohio states as follows:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior; [or]
>
> (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person; . . . .

Ohio Rev. Code § 2917.11.

Trooper Martin arrested Ellison for disorderly conduct after Ellison's outburst when Trooper Martin attempted to examine his eyes as part of a field sobriety test. Ellison became angry, used profane language, raised his voice to a scream, and waived his arms directly in front of Trooper Martin. Ellison argues that Trooper Martin lacked probable cause to arrest him for disorderly conduct because he did not use fighting words. A person cannot be convicted for disorderly conduct based on their speech alone "unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *Ohio v. Hoffman*, 57 Ohio St. 2d 129, 387 N.E.2d 239, 242 (1979). "Fighting words are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Ohio v. Thompson*, 95 Ohio St. 3d 264, 767 N.E.2d 251, 255 (2002) (internal quotation and citation omitted). Vulgar or profane language about the situation generally, as opposed to vulgar or profane language directed to the police officer, is not likely to be considered fighting words. *Middletown v. Carpenter*, No. CA2006-01-004, 2006 WL 1972061, at *2, 2006-Ohio-3625, at ¶¶ 15–16 (Ohio App. 2006). The Sixth Circuit confirmed this year that "profanity and verbal abuse" of police officers, standing alone, is not sufficient to justify an arrest. *Henry*, 814 F. App'x at 981.

The problem with Ellison's argument is that the arrest for disorderly conduct was not based on vulgar language alone. "[V]ulgar language, when accompanied by aggressive behavior, can be sufficient for a disorderly conduct conviction based on 'turbulent behavior.'" *Middletown v. Carpenter*, 2006 WL 1972061, at *3, 2006-Ohio-3625, ¶ 17 (Ohio App. 2006). "The word, 'turbulent,' in the context of Ohio's disorderly conduct statute, refers to tumultuous behavior or unruly conduct characterized by violent disturbance or commotion." *Carr v.*

*Bradley*, No. CIV.A. 2:07-CV-01053, 2009 WL 937145, at *8 (S.D. Ohio Apr. 2, 2009) (quoting *Ohio v. Reeder,* 18 Ohio St. 3d 25, 27, 479 N.E.2d 280 (1985)).

Trooper Martin faced a situation which had escalated from a routine traffic stop to an agitated confrontation. Ellison initially did not directly respond to routine questions about where he was going and whether he had been drinking. He next refused repeated requests, then commands, to exit his vehicle before he finally complied. He repeatedly challenged, in an increasingly quarrelsome manner, Trooper Martin's authority to conduct the traffic stop without a supervisor. Finally, when Trooper Martin attempted to use the flashlight to check his eyes, Ellison became aggressive, using profane language, shouting, and gesturing with his arms in close proximity to Trooper Martin. Ellison's outburst prompted Davis to tell him to "calm down."[4] Even Ellison testified during his deposition that he was "angry" at that moment and that "someone looking at that behavior would consider it to [have been] aggressive or in some way threatening." (Doc. 31-1, PageID 318.)

Although these facts present a close question, the Court concludes as a matter of law that Trooper Ellison had probable cause to arrest Ellison for disorderly conduct. It was reasonable for Trooper Martin to believe that Ellison was engaged in turbulent behavior that recklessly caused annoyance or alarm to another. Because Trooper Martin had probable cause to arrest Ellison for disorderly conduct, the Court need not and does not consider whether Trooper Martin also had probable cause to arrest Ellison for impaired driving, obstruction, or

---

[4] To be clear, Davis was supportive of her fiancé in her testimony and critical of Trooper Martin. It is fair to say that she was concerned that Trooper Martin would overreact to Ellison's outburst. (Doc. 31-3, PageID 618.) That does not change that fact that Trooper Martin could have reasonably believed based on Davis's comment that she was disturbed by Ellison's outburst.

17

failure to comply with an order.

It follows that Trooper Martin is entitled to qualified immunity on the Fourth Amendment claim for false arrest. Moreover, even if Trooper Ellison lacked probable cause, he still would be entitled to qualified immunity for his reasonable belief that he had probable cause. "[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation and citation omitted); *see also Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) ("The qualified immunity doctrine requires that probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness.") (internal quotation and citation omitted); *Slusher v. Delhi Twp., Ohio*, No. 1:08-cv-273, 2009 WL 2145608, at *10–11 (S.D. Ohio July 14, 2009) (finding qualified immunity even though officers lacked probable cause to make disorderly conduct arrest). Ellison has not met his burden of proof, and Trooper Martin is entitled to qualified immunity.

### C.     First Amendment Claim

Ellison also argues that Trooper Martin arrested him in retaliation for his protected speech and in violation of the First Amendment. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–463. The "right to be free from retaliatory arrest after insulting an officer was clearly established" before Ellison's arrest in 2016. *See Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 219 (6th Cir. 2011). "Nonaggressive

18

questioning of police officers is constitutionally protected" so long as the conduct does "not cross the line into fighting words or disorderly conduct." *Patrizi v. Huff*, 690 F.3d 459, 467 (6th Cir. 2012).

A plaintiff seeking to prove retaliatory arrest must prove three elements:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Kennedy*, 635 F.3d at 217. A motivating factor is a "but for" cause. *Id.* "Proximity in time can support an inference of a causal link." *Scheffler v. Lee*, 752 F. App'x 239, 253 (6th Cir. 2018).

In 2019, the Supreme Court settled a dispute in existing case law and held that "[t]he plaintiff pressing a retaliatory arrest claim [also] must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019); *see also Hartman v. Thompson*, 931 F.3d 471, 484 (6th Cir. 2019) (following *Nieves*).[5] It is not necessary to wade deeply into the weeds on the interplay between probable cause and retaliatory motives for an arrest before *Nieves*. It suffices to explain that the Supreme Court instructed in 2012 that because the law was "not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation[,]" then officers who made an arrest with probable cause were entitled to qualified immunity on a retaliatory arrest claim. *Reichle v. Howards*, 566

---

[5] The Supreme Court added a narrow caveat not applicable here for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. "[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Ellison makes the bald argument that the *Nieves* exception applies here, but the Court does not find the argument compelling in the absence of persuasive reasoning.

U.S. 658, 670 (2012). The Sixth Circuit has followed and applied *Reichle* by granting qualified immunity to officers accused of retaliatory arrests when probable cause was proven. *See*, *e.g.*, *Novak v. City of Parma*, 932 F.3d 421, 429 (6th Cir. 2019) ("If the officers did have probable cause, . . . they are entitled to qualified immunity."); *Phillips v. Blair*, 786 F. App'x 519, 529 (6th Cir. 2019) ("Without controlling authority clearly establishing a First Amendment right to be free from a retaliatory arrest otherwise supported by probable cause, we also reverse the denial of qualified immunity on this claim."); *Marshall v. City of Farmington Hills*, 693 F. App'x 417, 426–427 (6th Cir. 2017) (finding that officers who had probable cause were entitled to qualified immunity on a retaliatory arrest claim).

The Court concluded above that Trooper Martin had probable cause to arrest Ellison for disorderly conduct. As such, Ellison cannot establish a retaliatory arrest claim as a matter of law, and Trooper Martin is entitled to qualified immunity.

### IV. Conclusion

In light of the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED**.

**IT IS SO ORDERED.**

                                             *s/Michael R. Barrett*
                                            Michael R. Barrett, Judge
                                            United States District Court